IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | |
|---|---|
| BRITAIN AUTO GROUP LLC, <br><br> *Plaintiff,* <br><br> v. <br><br> CASEY JACKSON AND CASEY JACKSON FORD, LLC, <br><br> *Defendants.* | CIVIL ACTION FILE NO. <br> 3:26-CV-00056 |

## COMPLAINT FOR DAMAGES

Plaintiff Britain Auto Group LLC files this Complaint for Damages against

Defendants Casey Jackson ("Jackson") and Casey Jackson Ford, LLC for damages and

shows as follows.

### INTRODUCTION

Plaintiff purchased a Ford automobile dealership from Defendants at a price that

included $6,500,000 for goodwill (i.e., the value of the dealership that is not tied to its

tangible assets). As is customary in such transactions, Plaintiff determined the price it would

pay for the goodwill using a multiple of the dealership's annual income as reflected on the

financial statements that Defendants provided to Plaintiff. Defendants warranted and

represented to Plaintiff in the sale agreement that those financial statements fairly and

accurately depicted the dealership's financial performance. But unbeknownst to Plaintiff, the

financial statements included profits of a separate prefabricated house business that was not

being sold to Plaintiff as part of the deal. That undisclosed inclusion made the dealership

appear more profitable from the sale and service of Ford automobiles than it really was and allowed Defendants to obtain a higher purchase price for the dealership's goodwill than would have been paid but for the misrepresentation. Relying on this fraudulent misrepresentation, which breached the representations in the purchase agreement, Plaintiff paid millions of dollars more for the dealership's goodwill than it would have based on accurate financial statements. Plaintiff brings this Complaint for fraud and breach of contractual warranties to recover the difference in value between what it paid for and what it received and for other damages.

## PARTIES, JURISDICTION, AND VENUE

1.      Britain Auto Group LLC is a limited liability company organized and existing under Georgia law. Britain Auto Group's only member is Byron Britain ("Britain"), an individual citizen of Texas.

2.      Britain Auto Group is a citizen of Texas for purposes of diversity jurisdiction because Britain, its only member, is a citizen of Texas.

3.      Jackson is an individual citizen of South Carolina. Jackson may be served with process at 299 Coves End Point, Seneca, South Carolina 29678.

4.      Casey Jackson Ford, LLC is a limited liability company organized and existing under Georgia law. It may be served with process through Jackson, its registered agent.

5.      On Plaintiff's information and belief, Casey Jackson Ford's sole member is Jackson. Casey Jackson Ford is a citizen of South Carolina for purposes of diversity jurisdiction because its sole member is a citizen of South Carolina.

2

6.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

7.    This Court has personal jurisdiction over Casey Jackson Ford because the LLC is organized and exists under Georgia law.

8.    This Court has personal jurisdiction over Jackson under Georgia's long arm statute, O.C.G.A. § 9-10-91, because the suit arises from business he transacted in Georgia and his tortious acts and omissions as alleged in this Complaint occurred in Georgia.

9.    Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

10.    Venue is proper in the Athens Division of this district under this Court's Local Rule 3.4 because the claim arose in this division.

### FACTUAL ALLEGATIONS

**a. Defendants set up a separate prefabricated house business.**

11.    Casey Jackson Ford owned and operated a Ford automobile dealership located at 1435 East Main Street, Royston, Georgia, from 2011 until June 2022.

12.    Jackson, the owner of Casey Jackson Ford, was involved in the dealership's management and operations. Although the dealership had a general manager, Jackson maintained an office on the dealership's premises, hired employees, determined employee pay, and made business decisions for the dealership.

13.    Defendants began selling prefabricated houses in 2018.

14. Defendants did not keep their inventory of prefabricated houses at the Ford dealership's premises in Royston for sales to its customers. The houses were instead displayed and sold off a separate lot in Franklin, North Carolina.

15. Defendants operated the lot in Franklin under the trade name "Compact Cottages." They did not advertise Compact Cottages or the prefabricated houses as part of Casey Jackson Ford or the dealership. Banners on the Franklin lot advertised "Tiny homes for sale" and directed potential customers to CompactCottages.net but did not mention Casey Jackson Ford or any Ford dealership.

16. Defendants used the website CompactCottages.net to advertise the prefabricated houses for sale. CompactCottages.net made no mention of Casey Jackson Ford or any Ford dealership.

17. Defendants did not advertise prefabricated houses, Compact Cottages, or the Franklin lot to customers who came to the Ford dealership in Royston.

18. Defendants hired a salesman to sell prefabricated houses from the Franklin lot. Although this salesman was an employee of Casey Jackson Ford, he did not sell automobiles, and Casey Jackson Ford's automobile sales employees did not sell prefabricated houses. The prefabricated house salesman only visited the Ford dealership's premises infrequently to fill out paperwork.

19. Although Compact Cottages was effectively a separate business from the Ford dealership, operating from another location in another state, selling houses instead of vehicles, and catering to different customers, Jackson used Casey Jackson Ford to process

4

the prefabricated house sales and included revenue from prefabricated house sales on the financial statements for Casey Jackson Ford.

**b. Defendants use the prefabricated house business to create misleading financial statements for the Ford dealership.**

20.     Defendants used a software program named "Dealertrack" to manage the Ford dealership's operations, including inventory, sales records, and accounting, as well as to generate financial statements for Casey Jackson Ford.

21.     Defendants routinely processed prefabricated house sales through Dealertrack. When Defendants sold a prefabricated house from the lot in Franklin, the salesman or Jackson would call Casey Jackson Ford's office manager, Beth Whitmire, who worked in an office at the Royston dealership. Whitmire would then have the dealership's title clerk enter the house into Dealertrack as an inventory item on the dealership's records. Whitmire would then record the house's sale in Dealertrack, including the sale price and gross profit from the sale.

22.     Whitmire was also the bookkeeper for Casey Jackson Ford. At Jackson's direction, Whitmire included the gross profit from the prefabricated house sales on Casey Jackson Ford's income statements as part of its income.

23.     From 2018 through 2022, Defendants sold at least 102 prefabricated houses for a total gross profit of at least $1,197,555.21.

24.     Jackson, Whitmire, and Bob Benson, the general manager of Casey Jackson Ford, were the only individuals at Casey Jackson Ford who had access to the dealership's financial statements.

25.     Defendants sent the dealership's financial statements to Ford each month as required by Casey Jackson Ford's dealer agreement with Ford. These statements included income from Compact Cottages without disclosing to Ford that this income did not come from Ford dealership operations. Jackson boasted to some of the dealership's employees that he knew Ford's financial statement form better than Ford itself did.

**c. Defendants use the misleading financial statements to induce Britain to purchase the dealership at an inflated price**

26.     In or before August 2021, Defendants listed the dealership for sale. The listing stated that the dealership had monthly profits of $160,000, annual sales of $38,000,000, and generated annual cash flow of over $2,400,000. The listing's asking price included $7,000,000 for "Blue," an automotive industry term for "blue sky," meaning intangible assets and goodwill. The listing described $7,000,000 as "Approx 3.5 times earnings," implying that the dealership's profits were $2,000,000 per year. A true and accurate copy of the listing is attached to this Complaint as Exhibit A.

27.     The Ford dealership's annual profits were, in fact, well under $2,000,000. The dealership's profits in 2018, 2019, and 2020 were actually well under $1,000,000 per year without the inclusion of Compact Cottages' income. As of July 2021, the last reporting period before Defendants listed the dealership for sale, the dealership's profits for 2021 were far short of the pace necessary for $2 million in annual profitability without the inclusion of Compact Cottages' income.

28.     The listing did not disclose that the stated profit, sales, and cash flow figures included income derived from the non-Ford-dealership Compact Cottages sales, leaving

6

prospective buyers, including Britain, with the appearance that the dealership's operations were far more profitable than they actually were.

29.     On or about August 19, 2021, Britain's broker, Mike Lacey, contacted Defendants' broker, Joey McQuaig, about the listing. McQuaig sent Lacey copies of Casey Jackson Ford's financial statements for December 2018, December 2019, December 2020, and July 2021 on Defendants' behalf. Lacey emailed the financial statements to Britain the same day.

30.     The financial statements that McQuaig sent to Lacey on August 19, 2021, which were each labeled "Ford Motor Company Dealer Financial Statement," included income derived from both the Ford dealership's operations and the non-dealership sales of Compact Cottages prefabricated houses and other business activity unrelated to Casey Jackson Ford's sales and service of Ford automobiles as an authorized Ford Motor Company dealer. Those financial statements did not distinguish in any way between Ford dealership income and non-Ford-dealership income or even state that some income included was not from the dealership.

31.     Britain and Jackson executed a non-binding letter of intent on August 30, 2021, for Britain to purchase the dealership. The letter of intent reflected that Britain would pay Jackson $6,500,000 for the dealership's blue sky, a price to which Britain agreed based on the earnings reflected in the financial statements Defendants provided through McQuaig.

32.     Britain and James Baldridge, the manager of an automobile dealership Britain owns in Texas, reviewed the financial statements that Defendants provided to them through

Lacey. Based on their review, Baldridge sent Lacey a list of 28 questions to ask Jackson about various aspects of the dealership's performance, including how inventory was managed and how the dealership handled its accounting.

33.    Lacey and Jackson spoke over the phone on September 8, 2021, to discuss the purchase and sale of the dealership. They discussed the dealership's operations, financial statements, and purchase price, but at no point in the conversation did Jackson disclose that much of the income reported on the dealership's financial statements as disclosed to Britain was derived from Compact Cottages sales rather than dealership operations.

34.    After the September 8 call, Britain flew to Georgia to see the dealership. Jackson and Britain met in person to discuss the sale of the dealership and view the premises. At no point in this meeting did Jackson disclose that any of the income reflected on the Ford dealership's financial statements as provided to Britain was derived from Compact Cottages sales.

35.    Jackson insisted that Britain's visit to the dealership be after business hours. Because the dealership was closed when Britain visited, Britain did not have a chance to speak to any of the dealership's employees.

36.    Casey Jackson Ford and Britain executed an Asset Purchase Agreement (the "Agreement") on September 23, 2021, under which Britain agreed to purchase all of the Ford dealership's business assets. Casey Jackson Ford was the "Seller" under the Agreement.

37.    The purchase price that Britain agreed to pay under the Agreement included a purchase price of $6.5 million for "Intangible Assets," which were defined in part as "all of

Seller's intangible assets and goodwill (e.g., 'Blue sky') . . . associated with the Business."

Agreement § 3.1.

38. The "Business" was defined as the *Ford dealership. See* Agreement, recital A.

39. The "Business" as defined in the Agreement specifically excluded "Compact Cottages," the sale of prefabricated houses, or anything other than "a factory authorized automobile dealer engaged in the business of selling, leasing, financing and servicing FORD new motor vehicles, used motor vehicles, and related parts and accessories . . . ." *Id.*

40. In fact, the Agreement excluded from the sale "all assets of any kind, tangible or intangible, in Seller's non-automotive business named 'Compact Cottages'." Agreement § 1.11.

41. Because goodwill is an "intangible" asset, any goodwill associated with "Compact Cottages" was *not* a part of the transaction per the Agreement's terms.

42. Although Defendants were careful to exclude Compact Cottages from the sale of the Ford dealership, they did not disclose to Britain that much of the income on the financial statements of the dealership they were selling was derived from Compact Cottages sales rather than the Ford dealership Defendants were selling.

43. Casey Jackson Ford made certain representations and warranties to Britain in the Agreement to induce Britain to enter into it. Casey Jackson Ford made these representations and warranties to Britain "as of the date of this Agreement and as of the Closing Date (as if such representations and warranties were made on each such date)." Agreement § 5.

9

44.    Specifically, Casey Jackson Ford represented and warranted that "[t]o the best of Seller's knowledge, the books, records and accounts of Seller, all of which have been made available to Buyer, are complete, accurate and fairly reflect all material transactions, assets, and liabilities of Seller." Agreement § 5.19.

45.    Casey Jackson Ford also represented as follows in the Agreement:

> No representation or warranty by Seller in this Agreement, or other written schedule, statement or certificate furnished to Buyer by or on behalf of Seller in connection with the transaction contemplated by this Agreement, contains or will contain any untrue statement of a material fact, or omits or will omit to state a material fact necessary to make the statements contained herein not misleading.

Agreement § 5.16.

46.    The Agreement expressly allowed Britain to assign his rights under it to an entity he owned. *See* Agreement § 12.7.

**d.  Britain receives additional misleading financial statements from Defendants**

47.    The Agreement conditioned Britain's obligation to purchase the dealership's assets on Ford's approval of the sale. Britain and Defendants notified Ford of the Agreement soon after it was executed, and Ford ultimately approved the sale in April 2022.

48.    As part of Ford's standard process for approving the sale of a dealership, Ford sent Britain a spreadsheet comparing the past performance of Casey Jackson Ford to other Ford dealerships in the region and asked Britain to develop a forecast of sales and profits based on this data. The financial data on the spreadsheet for Casey Jackson Ford that Ford provided to Britain as part of this process was identical to the data on the financial statements that Defendants provided to Plaintiff. The spreadsheet from Ford thus included

profits from Casey Jackson Ford's prefabricated house sales without disclosing that these profits were not from Ford dealership operations.

49.     Receiving Casey Jackson Ford's financial data directly from Ford reinforced Britain's belief that the profits reported on the financial statements were accurate. Britain, who owns an automobile dealership in Texas, believed that Defendants' agreements with Ford would not have allowed them to submit financial statements to Ford that contained income unrelated to the dealership.

50.     Jackson emailed Britain updated financial statements for the dealership on November 11, 2021, and January 12, 2022. Like the financial statements Defendants sent to Britain through McQuaig before the Agreement was signed, the financial statements Jackson provided to Britain on November 11, 2021 and January 12, 2022 were labeled "Ford Motor Company Dealer Financial Statement" and included income from Compact Cottages without disclosing that this income was derived from prefabricated house sales rather than Ford dealership operations.

51.     Britain relied on these inflated historical profits in deciding to close on the transaction and pay $6,500,000 for the dealership's Intangible Assets.

52.     At no point before the closing of the transaction did Defendants or any of their agents disclose that much of the income shown on the dealership's financial statements was derived from Compact Cottages sales rather than the dealership.

**e. Britain closes on the dealership, which underperforms after closing.**

11

53.   Before the closing, Britain assigned his rights under the Agreement to Plaintiff Britain Auto Group LLC.

54.   Britain Auto Group LLC and Casey Jackson Ford, LLC then closed on the sale of the dealership on June 7, 2022, at which point Britain Auto Group took title to the dealership's assets and began to operate the dealership.

55.   At closing, Britain Auto Group paid Casey Jackson Ford $6,500,000 for the dealership's Intangible Assets (including goodwill). Britain Auto Group borrowed much of the purchase price for the dealership's assets, and Britain executed personal guarantees for the debt.

56.   Whitmire continued to work as the dealership's office manager for several weeks after the closing. During this time, she removed all physical files from the dealership related to Compact Cottages' house sales.

57.   Since the closing in June 2022, the dealership has generated significantly less revenue than the amounts reflected in the financial statements provided by Defendants before closing, in large part because the financial statements included revenue from the Compact Cottages business, which was excluded from the sale of the Ford dealership.

## CLAIMS FOR RELIEF

### Count I – Fraud
(Against both Defendants)

58.   Britain Auto Group incorporates paragraphs 1 through 57 above as if fully stated in this Count.

59.    Defendants knowingly misrepresented the dealership's profits by including the profits of the unrelated, non-dealership Compact Cottages business on the financial statements they sent to Britain before and after the execution of the Agreement despite the fact that the non-dealership business and goodwill associated with that business were excluded from the purchase.

60.    Under the Agreement's terms, Casey Jackson Ford made these misrepresentations to Britain as of the date of the Agreement and to Britain Auto Group on the closing date.

61.    Defendants knew that the financial statements they presented to Britain and Britain Auto Group falsely stated the dealership's financial position because Defendants directed that profits from each prefabricated house sale be manually entered into the Dealertrack software used to prepare the dealership's financial statements.

62.    Defendants made these misrepresentations to induce Britain Auto Group to purchase the dealership at an inflated price.

63.    Britain Auto Group relied on Defendants' misrepresentations to its detriment when it paid $6,500,000 to purchase the Intangible Assets (including goodwill) of the "Business" as defined in the Agreement, a price millions of dollars higher than the actual value of those assets.

64.    Britain Auto Group would not have closed on the transaction at the price listed in the Agreement if not for Defendants' misrepresentations about the dealership's profitability.

65.     Britain Auto Group's reliance on Defendants' misrepresentations was reasonable and justified. Britain conducted due diligence by, among other things, visiting the dealership's premises, meeting with Jackson in person to discuss the sale before executing the Agreement, and by having his broker ask Jackson a list of detailed questions about the dealership's performance and accounting before executing the Agreement.

66.     Britain Auto Group is entitled to recover its actual damages caused by Defendants' fraud in an amount to be proven at trial.

## Count II – Punitive Damages
(Against both Defendants)

67.     Britain Auto Group incorporates paragraphs 1 through 57 above as if fully stated in this Count.

68.     Defendants' conduct in defrauding Britain Auto Group as described above shows willful misconduct and fraud as defined by O.C.G.A. § 51-12-5.1.

69.     Britain Auto Group is entitled to recover punitive damages from Defendants under O.C.G.A. § 51-12-5.1 in an amount sufficient to punish and deter fraudulent conduct like that demonstrated by Defendants to be determined in the jury's enlightened conscience.

## Count III – Breach of Contract
(Against Casey Jackson Ford, LLC)

70.     Britain Auto Group incorporates paragraphs 1 through 57 above as if fully stated in this Count.

14

71. As set forth above, Casey Jackson Ford represented and warranted under the Agreement that its books, records, and accounts would be complete, accurate, and fairly represent all its material transactions.

72. As set forth above, Casey Jackson Ford also represented and warranted under the Agreement that no statement it provided to the buyer would contain an untrue statement of material fact or omit any material facts necessary to make the statement not misleading.

73. Under the Agreement's terms, Casey Jackson Ford made these representations and warranties both on the effective date of the Agreement and on the date of the closing.

74. Casey Jackson Ford breached the Agreement's representations and warranties by providing financial statements for the dealership to Britain and to Britain Auto Group without disclosing that much of the income on the financial statements was derived from the separate Compact Cottages business that had been specifically excluded from the sale.

75. Britain Auto Group suffered damages when it paid millions of dollars more for the dealership than Plaintiff or any similar buyer with the benefit of the materially relevant financial information required to be disclosed under the Agreement would have paid.

76. Britain Auto Group is entitled to recover actual damages equal to the difference in value between what it paid for the dealership and the true value of the dealership and other damages in an amount to be proven at trial.

## Count IV – Contractual Attorneys' Fees
(Against Casey Jackson Ford, LLC)

77.     Britain Auto Group incorporates paragraphs 1 through 57 above as if fully stated in this Count.

78.     The Agreement states that "[i]n the event any Party instigates any litigation or any proceeding to enforce or protect its rights under this Agreement, the Party prevailing in any such litigation or proceeding shall be entitled, in addition to all other relief, to reasonable attorneys' fees, out-of-pocket costs and disbursements . . . ." Agreement § 12.8.

79.     Britain Auto Group is entitled to recover its attorneys' fees, out-of-pocket costs and disbursements from Casey Jackson Ford in an amount to be proven at trial.

## Count V – Attorneys' Fees under O.C.G.A. § 13-6-11
(Against both Defendants)

80.     Britain Auto Group incorporates paragraphs 1 through 57 above as if fully stated in this Count.

81.     Defendants' conduct displays bad faith and stubborn litigiousness, and Defendants have caused Britain Auto Group unnecessary trouble and expense as defined by O.C.G.A. § 13-6-11. Britain Auto Group is thus entitled to recover its attorneys' fees and expenses of litigation from Defendants in an amount to be proven at trial.

### REQUEST FOR RELIEF

Britain Auto Group requests that the Court award it a money judgment for:

(a)     Actual damages in an amount to be proven at trial;

16

(b)    Punitive damages in an amount sufficient to punish and deter the kind of fraudulent conduct displayed by Defendants;

(c)    All attorneys' fees, costs, and litigation expenses incurred by Britain Auto Group;

(d)    Pre- and post-judgment interest as allowed by law; and

(e)    Such other relief as the Court deems just and appropriate.

Britain Auto Group seeks all relief that this Court deems just and equitable.

**Britain Auto Group demands a jury trial.**

Dated: May 14, 2026.

**JOHNSON MARLOWE LLP**

/s/ Spence Johnson
Spence Johnson
Georgia Bar No. 395469
William O'Bryan
Georgia Bar No. 584851

335B Oconee St.
Athens, GA 30601
(706) 425-8740 t
(706) 850-6400 f
spence@johnsonmarlowe.com
will@johnsonmarlowe.com

**ATTORNEYS FOR BRITAIN AUTO GROUP LLC**

17

**Exhibit A**
Dealership Listing

LISTING NUMBER 200521
Ford Dealership
Location: NE Georgia

This is a ONE PACKAGE Deal
Read on for description

| | |
|---|---|
| THE OFFER | - One dealership is up and running and doing well. Another Open Point (15 miles from original Dealership) has been awarded to the Selling Dealer |
| FACILITIES | - Present dealership is 10.89 acres and 23,000 +/- SF in three buildings.  This Dealership will Remain open until new dealership has been built and is up and running.<br>Real Estate for the Open Point dealership has been purchased and it is 12 acres adjacent to Home Depot and WalMart. |
| LAKEFRONT | - The new location is in a Lakefront community. Ford has performed extensive Due Diligence On the New Location. One of largest (60,000 acres) lake in the SE USA. A mecca for vacationers, Retirees, Weekenders and 2nd Home enthusiasts in a three state area.  Abundance of water   and nearby Mountains. |
| SELLER | - Ready to retire, desiring exit strategy.  Open to various financial and legal structures. Dealer will stay in some capacity or Leave depending upon the Buyer. |
| STAFF | - Well trained with longevity…no "newbees." |
| POPULATION | - 150,000 less than 1 hour away and 500,000 less than 2 hours away HUGE and Growing |
| LOCATION | - Interstate Accessible (6 miles) Lots of new home construction at New Location |
| NICHE | - Excellent Advertising/Marketing Partner utilized by seller. |
| PRODUCTION | - Sales – Average monthly 30 New and Used 65 2020 =7 |
| PROFIT | - $160,000/monthly  BEFORE  EBITA Or DEALER ADD-BACKS. |
| SCENARIOS | - The Prospect would buy the existing dealership.  The prospect could either buy the Existing dealership's Real Estate or Lease the Real Estate. The existing dealer may Want to keep the real estate and when the existing dealership is Closed, existing Dealer will maintain the existing Real Estate as a Pre-Owned Operation.<br>As stated above Seller is OPEN to different scenarios. |

IMPORTANT   IMPORTANT   IMPORTANT
SELLER "MAY" WITHDRAW THIS OPPORTUNITY IF
A BUYER AND SELLER HAS NOT REACH AT LEAST A
GENTLMAN'S AGREEMENT PRIOR TO OCTOBER 16, 2021

| | | | |
|---|---|---|---|
| Furniture, Fixtures, & Equipment   (Depreciated value) | $   500,000 | Asking Price     $ 7,700,000 plus all Real Estate | |
| Inventory (Parts and TBA) Subject to Physical Count | $   200,000 | Down Payment  Negotiable | |
| Land and Building (Present Facility should appraise Open Point at $1.75M | $ Appraised $ 2.3M range) | | |
| | | Annual Sales | $38 M   (normalized) |
| Other Assets       Blue (Approx 3.5 times earnings) | $  7,000,000 | Cash Flow | Est. $2.4M + Present Dealership |
| Liabilities | Assume Floor Plan & any operational leases | | |

CONFIDENTIALITY & NONDISCLOSURE REQUIRED
For Further Information Contact:

Joey McQuaig
Business Realty
706-810-0176

Scanned with CamSca